STATE of Missouri,
Plaintiff–Respondent,

v.

James Lee RAINES,
Defendant–Appellant.

No. 15153.

Missouri Court of Appeals,
Southern District,
Division Two.

March 15, 1988.

Motion for Rehearing or Transfer
Denied March 30, 1988.

Application to Transfer Denied
May 17, 1988.

Elizabeth A. Bock, Springfield, for defendant-appellant.

William L. Webster, Atty. Gen., Breck K. Burgess, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

FLANIGAN, Judge.

A jury found defendant James Raines guilty of rape, § 566.030,[1] and sodomy, § 566.060, and he was sentenced to five years' imprisonment for each offense, the sentences to run consecutively. Defendant appeals.

Defendant's first point is that the trial court erred in failing to sustain his motion to dismiss because Count II of the information, on which the sodomy conviction was based, "fails to allege essential elements of the offense of sodomy."

---

**1.** All references to statutes are to RSMo 1986, V.A.M.S., and all references to rules are to Missouri Rules of Court, V.A.M.R.

In addition to its formal portions, Count II of the information reads:

"[T]he defendant, in violation of Section 566.060, RSMo, committed the felony of sodomy, punishable upon conviction under Section 566.060.2, RSMo, in that on or about the 16th day of July, 1986, in the County of Greene, State of Missouri, [defendant] had deviate sexual intercourse with S.K., to whom defendant was not married, without the consent of S.K. by the use of forcible compulsion."

Count II set forth the full name of S.K., the victim.

In *State v. Evans*, 701 S.W.2d 569, 576–577[8,9] (Mo.App.1985), an information charging sodomy in substantially the same language as Count II of the instant information was held to be sufficient. The court rejected defendant's argument that the information failed to inform the defendant of the offense with which he stood charged and failed to state plainly and concisely the essential facts constituting the crime. The court pointed out that the information followed the pattern form MACH–CR. 20.08.

The only difference between Count II of the instant information and the information in *State v. Evans* is that the latter information had the word "forcible" before the word "sodomy." MACH–CR. 20.08 similarly does not contain the word "forcible" preceding the word "sodomy." Rule 23.-01(b) sets forth what an information must contain. Count II of the instant information is substantially consistent with MACH–CR. 20.08 and thus, as provided in Rule 23.01(e), it complies with Rule 23.-01(b). Defendant's first point has no merit.

■ Defendant's second point is that the evidence is insufficient to support the rape and sodomy convictions because the testimony of S.K., the prosecutrix, was so contradictory and inconsistent as to require corroboration.

In determining whether the evidence is insufficient to support the verdict, this court must view the evidence in the light most favorable to the state, consider all substantial evidence and all legitimate inferences fairly deducible therefrom tending to support the verdict, and reject contrary and contradictory evidence. *State v. Petrechko*, 486 S.W.2d 217, 218[1] (Mo.1972). All evidence unfavorable to the state must be disregarded, *State v. Summers*, 506 S.W.2d 67, 69[1] (Mo.App.1974), except to the extent that the evidence affects defendant's claim of contradiction and inconsistency.

In a prosecution for rape, corroboration of the victim's testimony is not required unless that testimony "is so contradictory and in conflict with physical facts, surrounding circumstances, and common experience that its validity is thereby rendered doubtful." *State v. Harris*, 620 S.W.2d 349, 353[5] (Mo. banc 1981). Resolution of conflicts of evidence and determination of the credibility of witnesses are jury matters, and this court is to determine only whether there was substantial evidence to be believed by the jury which would sustain a guilty verdict. Id. at 354. The same principles apply to a prosecution for sodomy. *State v. Wilson*, 361 Mo. 78, 233 S.W.2d 686, 688[4–6] (1950).

The state's principal witness was S.K., the victim. Only she and defendant were present during the commission of the offenses.

S.K. testified that she and her stepsister K.M. went to Graffiti's Lounge in Springfield about 9:00 p.m. on July 15, 1986. There they had some drinks. Defendant sat down at their table and bought the two women drinks. K.M. had to go to work at midnight and she asked defendant if he would give S.K. a ride to K.M.'s apartment. Defendant agreed to do so. During the course of the evening defendant bought a rose for S.K.

K.M. went to work around midnight. Thirty minutes later, S.K. and defendant left the lounge in defendant's pickup truck. Instead of taking S.K. to K.M.'s apartment, defendant drove her to a wooded area.

S.K. testified that defendant stopped the truck and ordered her to take off her clothes. "... He pulled out a black case from his glove box and said if I didn't do everything that he told me he would kill

me. State's Exhibit 4, a black leather case, is the case he pulled out of the glove compartment."

S.K. further testified that defendant sodomized her and had intercourse with her. The two were at the scene for an hour or an hour and a half, during which time defendant committed several acts of rape and sodomy. At one juncture S.K. told defendant she had to relieve herself and he gave her some tissue which she used and then threw on the ground. S.K. testified that "while everything was going on [defendant] took my purse and kept it over on his side and a lip liner of mine fell out on the ground." She also testified that defendant threw the rose out on the ground.

After the offenses were completed, defendant drove S.K. to K.M.'s apartment and left her there. S.K. testified that she ran into the apartment "and called the police as fast as I could. I wanted for them to come. I couldn't get the key out of the door and I was afraid [defendant] was going to come back so they kept me on the line and talked to me until they got there. After I talked to the police I called my father. [Defendant] telephoned and said, 'Don't be an idiot.' The police were there and I tried to hang onto the phone as soon as I knew who it was, but he hung up. I recognized his voice."

The police took S.K. to a hospital where she was examined. Later that morning the police took S.K. to the scene, where the rose, the tissue, and the lip liner were found. S.K. testified she was not married to defendant and did not know him before that night.

S.K.'s testimony concerning the events at Graffiti's Lounge was corroborated by K.M. and by the lady who sold the rose to defendant. Police officer Williamson, who was dispatched to K.M.'s apartment at 2:05 a.m., testified that S.K. was there when he arrived and that she was quite upset and said she had been sexually assaulted. While he was talking to S.K., the phone rang and she answered it. The officer testified that S.K. became hysterical and said, "it was him that called."

A state's witness who saw S.K. at the hospital at about 3:00 a.m. testified that S.K. was "emotionally distraught." A registered nurse examined S.K. about 3:00 a.m. and S.K. was "upset and teary eyed." Officer Claypool accompanied S.K. to the scene on the morning of July 16 and found the rose, the lip liner, and the tissue.

Officer Gary Dulen, who arrested defendant on July 18, 1986, advised him of his Miranda rights. Defendant informed the officer that he had not been at Graffiti's Lounge on the night of the 15th, did not buy a rose there, and did not have sex with anyone that night except with his wife. The officer found a black leather case, state's Exh. 4, in the glove compartment of defendant's truck.

Testifying in his own behalf, defendant admitted being with S.K. and K.M. at Graffiti's Lounge and leaving the lounge with S.K. in his pickup truck. Defendant said that while they were sitting at a stop light he "made a pass" at S.K. "I kissed her and she kissed me back." He admitted driving to the wooded area. In general his testimony was that the sexual acts took place, but that the heavier petting was initiated by S.K. and that she consented to the acts of intercourse and sodomy. He admitted that he had lied to officer Gary Dulen about not being in Graffiti's and not buying the rose and having sex with his wife. Defendant was not married. He also admitted that he had a black case, state's Exh. 4, in the pickup truck. "It is a case for numb chucks ... some kind of protection in case of robbery." He testified that the black case was in the glove compartment at all times.

In support of his claim that S.K.'s testimony was so contradictory and inconsistent as to require corroboration, defendant's brief states:

"When the couple left the bar S.K. testified she believed defendant was taking a five to seven mile shortcut through the country. They carried on normal conversation. She testified on direct examination the defendant showed her a black case when he ordered her to disrobe. On cross-examination she admit-

ted she told hospital personnel defendant held a gun on her. She denied telling law enforcement officers the defendant displayed a gun. Officer Claypool subsequently testified that in her statement S.K. had said defendant displayed a gun and a holster."

On direct examination S.K. testified that defendant "pulled out a black case from his glove box and said if I didn't do everything that he told me, he would kill me." On cross-examination S.K. was asked if she had told "two people" that he pulled a gun on her. Her answer was, "He pulled a case out and said it had a gun in it." Defense counsel then asked, "If [officer Claypool] quotes you as saying 'he pulled out a pistol in a holster,' would that be right?" The victim's answer was, "Isn't that the same thing as pulling out a gun in a case?" Defense counsel asked her, "After this event were you telling the people over at the hospital that the defendant had pulled a gun on you?" Her answer was, "Probably.... because as far as I am concerned that is what he did. He threatened my life and I didn't want to die and I sure didn't want him to get that gun out and wave it around." There are no significant contradictions here.

Defendant's brief says:

"S.K. further testified on direct examination that she had sexual intercourse with the defendant two times and oral intercourse with the defendant two times. On cross-examination she admitted she told law enforcement officers she had sexual intercourse with the defendant three times and oral intercourse with the defendant three times. She and the defendant were at the location for an hour."

Of course one act of rape and one act of sodomy were sufficient to warrant the convictions. It is true that on direct examination S.K. stated that two rapes and two acts of sodomy were committed. On cross-examination defense counsel asked if she "told the deputies that you had oral sex with this man three times." Her answer was, "That's quite possible." The following then occurred:

"Q. Well, let's take a look at your statement. Says here three times, doesn't it? Right above where it's circled there.

You see that it says number three there (indicating).

A. Yes, I do.

Q. Now, today in your testimony when [the prosecutor] was examining you here you only indicated you had oral sex with him twice. Is that right?

A. Yes, sir.

Q. And, you had intercourse with him three times, too, didn't you?

According to your statement and—

A. I don't recall to be truthfully honest with you. I don't recall.

Q. Well, three and three's six, isn't it?

A. Yes, sir.

Q. Three times orally, you had six times, right?

A. Yes, sir."

The "statement" referred to by counsel was not identified in that line of interrogation and it is not in this record. A preliminary hearing was held in the case, and defendant's counsel took S.K.'s deposition prior to the trial. In view of the nature of the acts to which S.K. had been subjected and the number of times she gave her testimony, it would be unreasonable to expect her testimony to be totally free of inconsistency. The jury could well have inferred that some of the alleged inconsistencies were attributable to leading questions propounded by dogged and skillful counsel in a trial atmosphere and were not the product of perjury.

Defendant's brief says:

"S.K. stated the defendant threw the rose he had purchased for her out the window with the remark that 'Well, I guess you don't want this anymore.' Officer Claypool testified in her statement S.K. admitted she had thrown the rose out the window without the accompanying remarks from the defendant."

The fact is that officer Claypool testified that S.K. did not tell him that defendant threw the rose out of the car. Claypool

said, "I believe she stated that [defendant] threw it out." Although counsel referred to "Exhibit B" in his cross-examination of Claypool as an alleged statement of S.K., in which "she says she threw it out," Exhibit B is not in the record. However, officer Claypool testified that he had read the statement. Apparently referring to the statement, defense counsel asked, "There is a number of inconsistencies, isn't there?" Claypool answered, "Oh, not at my recollection, no."

Finally defendant's brief claims that S.K.'s testimony is not credible because "S.K. did not sustain any physical injury and there was no medical evidence of rape or sodomy presented. S.K. admitted that defendant was smaller and weighed less than she." That argument overlooks the evidence that defendant had threatened the life of S.K. and led her to believe that a gun was at his immediate disposal.

The paramount factual issue for the jury to resolve was whether S.K. was forced to undergo the sexual acts or whether she freely consented to them. The testimony of the state's witnesses other than S.K. fully supported her version of the events. There was no inconsistency in her testimony on the critical issue of coercion. Defendant told several lies to officer Dulen and admitted doing so. Such conduct is inconsistent with his version.

This court holds that the evidence was sufficient to support the rape and sodomy convictions. Defendant's second point has no merit.

Defendant's third point is that the trial court erred in failing to sustain defendant's two motions for a bill of particulars "because the information charging defendant with committing 'deviate sexual intercourse' fails to allege essential elements of the offense of sodomy." This point pertains only to Count II of the information on which the sodomy conviction was based.

■ If an information fails to inform the defendant of the particulars of the offense sufficiently to prepare his defense, the court may direct or permit the filing of a bill of particulars. A motion for a bill of particulars may be made before arraign-

ment or within ten days after arraignment or at such later time as the court may permit. Rule 23.04. A motion for a bill of particulars is addressed to the sound discretion of the trial court, *State v. Mace*, 357 S.W.2d 923, 926 (Mo.1962); *State v. Hafeli*, 715 S.W.2d 524, 527 (Mo.App.1986), and there can be situations where the court abuses its discretion in not directing the filing of a bill of particulars. See, for example, *State v. Mitchell*, 704 S.W.2d 280 (Mo.App.1986).

■ "The function [of a bill of particulars] is limited to that of informing the defendant of the particulars of the offense *sufficiently to prepare his defense*." *State v. Mace*, supra, at 926. (Emphasis in original.) A bill of particulars is not to be used for the purpose of making the state reveal the details of the evidence upon which it seeks to establish its case. Id. Where a motion for a bill of particulars fails to set forth what additional facts are sought and there is no showing that defendant was prejudiced by the denial of the motion, this court has held that the trial court did not abuse its discretion in denying the motion. *State v. Feeler*, 634 S.W.2d 484, 487 (Mo.App.1981).

■ Although defendant's third point mentions two motions for a bill of particulars, the record contains only one such motion and it was filed more than ten days, indeed six months, after arraignment. Apparently defendant did not call it to the attention of the court, for it did not receive a ruling. Rule 24.04(b)(4), dealing with motions before trial, provides that such a motion shall be heard and determined before trial "*on application of* the state or *the defendant*, unless the court orders that the hearing and determination thereof be deferred until the trial." (Emphasis added.) The first motion was overruled, but the record does not contain a copy of it.

In this trial there was no issue as to whether the various sexual acts had been committed. The significant question for the jury was whether those acts were the product of consent or coercion. Only two people were present during their commis-

sion. A preliminary hearing was held. Although the record does not show whether S.K. testified at the preliminary hearing, it is most likely that she did. Whether she did or not, the record does show that the defendant took S.K.'s deposition prior to the trial. The cross-examination of defense counsel demonstrates that, prior to the trial, he was completely familiar with S.K.'s version of the sordid incidents. Defendant's brief makes no effort to delineate what additional facts were sought by his motions for a bill of particulars, nor does it argue how defendant was prejudiced by failing to receive a bill of particulars. Defendant's third point has no merit.

The judgment is affirmed.

PREWITT, P.J., and HOGAN and MAUS, JJ., concur.